[798 NYS2d 367]

Commissioners of the State Insurance Fund, Respondent, v Photocircuits Corporation, Appellant.

First Department, June 9, 2005

## APPEARANCES OF COUNSEL

*Arent Fox PLLC*, New York City (*David N. Wynn* and *Deanne M. Ottaviano* of counsel), for appellant.

*Gellis & Melinger, LLP*, New York City (*Jan Ira Gellis* and *Douglas J. Hayden* of counsel), for respondent.

*Law Offices of Ronald S. Pordy*, New York City (*Ronald S. Pordy* and *Mitchell B. Reiter* of counsel), for Independent Insurance Agents and Brokers of New York, Inc., amicus curiae.

## OPINION OF THE COURT

MAZZARELLI, J.

In this action for recovery of additional workers' compensation insurance premiums, defendant, Photocircuits Corporation, appeals the grant of summary judgment to the plaintiff, Commissioners of the State Insurance Fund (Fund). Defendant asserts that the Fund breached the express terms of its policy to investigate and defend claims. Plaintiff responds that defendant is required to pay these premiums for documented losses and that defendant has no defense as there is no cognizable action in New York for breach of an "implied obligation of good faith and fair dealing" against a workers' compensation insurer.

Employers have long been required to provide their employees with workers' compensation insurance. Indeed, this requirement goes back to the early years of the 20th century. Previously, work-related injuries were governed by traditional tort law. However, because of the Industrial Revolution in the 19th and early 20th centuries, and the concomitant increase in workplace injuries, a number of states enacted workers' compensation legislation (*see* 1 Larson's Workers' Compensation Law § 2.07, at 2-13).

In 1914, New York enacted its first workers'[1] compensation statute (L 1913, ch 816). While the statute has been amended numerous times over the years, its purpose remains the same, to ensure a swift and secure source of benefits to the worker while protecting the employer from multiple common-law tort actions (*O'Rourke v Long,* 41 NY2d 219, 222 [1976]). The price to the worker was the loss of the right to bring an action, making an award by the Workers' Compensation Board (the Board) the sole remedy. The price to the employer was the payment of insurance premiums.

The Workers' Compensation Board, a unit of the State's Department of Labor, has assumed all of that department's rights, powers and duties with respect to workplace injuries (Workers' Compensation Law § 142). The Board, which has some of the characteristics of a court, essentially administers the compensation program. Some of its responsibilities include:

> "[the] power to hear and determine all claims for compensation or benefits or relating to special funds created under the provisions of this chapter . . .; to require medical service for injured employees . . .; to approve and fix attorney's fees and claims for medical service . . .; to approve agreements, to modify or rescind awards, to make conclusions of fact and rulings of law, to certify questions to the appellate division of the supreme court, to enter orders in appealed cases, to determine the time for the payment of compensation, to order the reimbursement of employers for amounts advanced, to assess penalties, . . . to order physical examinations, to take testimony by depositions; and to have and exercise all other powers and duties, exclusive of purely administrative functions, originally conferred or imposed upon the workmen's compensation commission by this chapter . . . ." (Workers' Compensation Law § 142 [1].)

---

**1.** In 1984 the Legislature added language to section 1 of the Workers' Compensation Law to make it gender neutral. In 1978 the Legislature also changed the language throughout the article from "workman" to "worker" and "workmen" to "workers" (Minkowitz, Practice Commentaries, McKinney's Cons Laws of NY, Book 64, Workers' Compensation Law § 1, at 5 [2005]).

The Workers' Compensation Law governs compensation by an employer[2] to its employees[3] for injuries or death in the course of employment. Except in the limited circumstances where an employer can become self-insured, employers generally purchase workers' compensation insurance policies to guarantee performance of this obligation.[4] They can obtain these policies from either an authorized private company or, as here, from the Fund. The Fund is also under the jurisdiction of the State Department of Labor (Workers' Compensation Law § 76). Its premiums are "generally competitive with th[ose] charged by private insurance companies, although the latter may, unlike the [Fund], reject applicants for policies based upon their own underwriting criteria" (Minkowitz, Practice Commentaries, Workers' Compensation Law § 76, at 136 [1994]). Fewer than half of the states in this country have state-sponsored funds, and the New York Fund provides coverage for more than a third of all employers in the state, including all state employees (id.) Moreover,

> "[The Fund is] vested with certain sovereign powers and the mantle of the state's sovereign immunities . . . . [However] its function is akin to that of a private insurance carrier, and in addition to insuring employers against the liability imposed upon them by law, is a self-insurer of its own employees . . . . A claim against [the Fund] is cognizable only in the Court of Claims, and may not be presented as a setoff or counterclaim in the Supreme Court."
> (111 NY Jur 2d, Workers' Compensation § 1016.)

For the policies it provides, the Fund offers two types of premium plans: a "Retrospective Rating Plan" (RRP) and a "Guaranteed Cost Plan" (GCP). Under the RRP, premiums are dependent upon the insured's claims experience during a policy period. The Fund is supposed to issue the insured periodic bills for this type of premium which reflect claims activity. By connecting the premium to claims experience, RRP gives the

---

2. "Employer" is defined at Workers' Compensation Law § 2 (3).

3. "Employee" is defined at Workers' Compensation Law § 2 (4).

4. If an employer does not provide workers' compensation insurance, an employee injured on the job has the option to either claim compensation under the statute, or bring an action for damages (Workers' Compensation Law § 11). If the employee opts for such an action, he or she need not "plead or prove freedom from contributory negligence nor may the [employer] plead as a defense that the injury was caused by the negligence of a fellow servant nor that the employee assumed the risk of his or her employment, nor that the injury was due to the contributory negligence of the employee" (id.).

employer an incentive to take an active role to reduce employee claims. The amount of any Fund retrospective premium is not considered final until all awards for claims during the policy period are paid in full. By contrast, a GCP premium does not take claims experience into consideration.

In this case Photocircuits purchased its policy from the Fund for the period October 1, 1992 to October 1, 1993 and elected the RRP premium. Part One of the policy provides:

"A. How This Insurance Applies

"This workers compensation insurance applies to bodily injury by accident or bodily injury by disease . . . .

"1. Bodily injury by accident must occur during the policy period.

"2. Bodily injury by disease must be caused or aggravated by the conditions of your employment . . . .

"B. We Will Pay

"We will pay promptly when due the benefits required of you by the Workers Compensation Law.

"C. We Will Defend

"We have the right and duty to defend at our expense any claim or proceeding against you for benefits payable by this insurance. We have the right to investigate and settle these claims or proceedings.

"We have no duty to defend a claim or proceeding for benefits payable by this insurance."

While defendant's initial basic premium under the policy was $150,177.39 for October 1992 to October 1993, by 1996, it had paid $627,020.39 for that period. Now, the Fund, through this action, is seeking an additional $466,100, plus costs (pursuant to State Finance Law § 18 [5]), to cover certain additional claims which arose during the term of the policy but were resolved between 1996 and 2001.

The Fund's handling of four employees' claims is at issue. They are: Traore Sekou, Maria Labrada, Gennaro Larice and Valerie Diaz. The bulk of the $466,100 claimed by the Fund is attributable to Labrada, Larice and Diaz.

The Board paid Traore Sekou for injuries he allegedly sustained at Photocircuits on December 7, 1992. In May 1996, four years after this claim was filed and substantial sums had been issued, the Fund's Office of Claimant Services called Sekou. During this call, Sekou advised the Fund that he had never worked for Photocircuits, and that he suspected a former roommate had used his name and Social Security number to file for workers' compensation and had taken the checks. Apparently, after Sekou informed the Fund that the claim had been made by an imposter, it nevertheless paid that imposter another $39,000. In total, the Fund paid $66,626.64 on this claim.

The second contested claim was that of Maria Labrada, who filed for work-related asthma. Labrada did not produce any medical evidence that her injuries were related to her job; however, a physician employed by the Fund did confirm that she had asthma. That report, dated June 24, 1997, did not discuss when the asthma began, and it was the sole basis for the Board's subsequent award of benefits to her. It is uncontested that years earlier, on February 8, 1993, Photocircuits had reported to the Board that Ms. Labrada's asthma was a condition which preexisted her employment with it. Photocircuits gave the Fund information that Labrada had filed a prior claim, and it anticipated that the Fund would ask the Board to invoke a specific provision of the Workers' Compensation Law that limits an employee's liability for preexisting injuries and qualifies her for the Special Disability Fund (*see* Workers' Compensation Law § 15 [8], discussed *infra*). Had the Board found the provision applicable, Photocircuits' liability would have been reduced from $116,501 to $14,197.

The third contested claim was that of Gennaro Larice. On August 19, 1993 Larice filed a workers' compensation claim reporting a work-related lung injury. On or about November 5, 1993, Photocircuits informed the Fund that Larice had had the lung condition, sarcoidosis, before he was employed by it. Defendant produced evidence that this condition had existed since 1990. Again, the Fund did not invoke the limiting provision which would have capped Photocircuits' exposure to $38,964. Instead, Larice received a lifetime award of $367,762.

The fourth contested claim was that of Valerie Diaz. On April 23, 1993, Diaz, who was seven months pregnant, allegedly fainted at work and suffered head and back injuries. She thereafter filed a claim for workers' compensation benefits. The Fund controverted her claim, but apparently lost her claim file. Fund

representatives went to several of Diaz's Board hearings without her claim file, and the Fund was fined by the Board for repeatedly, unnecessarily adjourning claim hearings. After Diaz prevailed before the Board, a Fund representative recommended that the case be appealed, noting that "[t]his is a time critical issue and must be done immediately." The Fund thereafter prepared a notice of appeal, but failed to file it. After the statutory time limit had elapsed, the Fund settled this claim for a payment of $40,000 to Diaz. In addition, Photocircuits asserted that Diaz's claim file contains billings from other individuals' cases, raising a question as to whether the amounts claimed for Diaz are even attributable to her claim or in fact relate to other cases.

The Fund moved for summary judgment asserting that there were no issues of fact as to its entitlement to the amounts sought. In support of its motion, the Fund submitted the policy, an audit dated October 31, 1993, a number of accounting statements, and a final statement of account showing a balance due of $466,100. The Fund also submitted the affidavits of Vincent Troianiello, the Fund's Director of Underwriting, and Reuben Epstein, the Fund's Director of Actuarial Services. Both Troianiello and Epstein explained the RRP concept and provided evidence of the underlying accountings to support the $466,100 claimed premium.

Photocircuits opposed the motion and cross-moved for summary judgment. It claimed that the Fund had breached the terms of the policy in failing to discharge its obligations to minimize and defend against unauthorized payments. In support of the cross motion, Photocircuits presented the affidavit of Jennifer Minerva, its Manager of Risk Management. Minerva affirmed that she had worked for Photocircuits for five years and has responsibility for the oversight of workers' compensation claims. The Minerva affidavit detailed the Fund's mishandling of the Larice, Labrada and Diaz claims. Photocircuits also submitted the affidavit of Maureen Seward, an outside workers' compensation specialist. Seward stated that she had 23 years of experience in the administration of workers' compensation claims. She asserted that the Fund mishandled Sekou's case by paying benefits to a known impostor, and that it failed to limit Photocircuits' liability for Labrada's and Larice's claims for preexisting injuries. She also opined that the Fund acted improperly regarding Diaz's claim by failing to appear at a number of hearings because of a misplaced claim file. She stated

that as a result of unnecessary adjournments with respect to the Diaz hearing, the Fund was fined by the Board, and she questioned the propriety of the Fund's settlement of this concededly ambiguous claim. Seward also took issue with the Fund's billing practices, noting that the Diaz file contained claims from other Photocircuits employees. Seward summarized her review of the files as follows:

"the manner in which [the Fund] handled [these four employees'] cases goes beyond mere negligence or carelessness. Instead, these claims files show [the Fund's] personnel's total disregard for Photocircuits' obligation to pay for the results of their inaction, as well as [the Fund's] failure to even attempt to meet its obligations as a Workers' Compensation claims handler for Photocircuits."

In its response to Seward's affidavit, the Fund offered reply affidavits from Troianiello, Epstein and Robert Sammons, the Fund's Director of Claims. Sammons affirmed that there is no requirement in the policy that the Fund communicate the status of its claims processing to Photocircuits. However, the Fund did not contradict Seward's allegations that it failed to defend Photocircuits' rights and that it paid a claim to a known impostor.

Supreme Court granted the Fund's motion for summary judgment for $466,100 plus costs. As relevant to the appeal, the court denied defendant's application for additional discovery regarding the parties' performance under the contract and the amount of claimed premiums attributable to plaintiff's failures versus the amount attributable to properly administered claims. The court also noted that Photocircuits did not object to the calculation of premiums until it received the Fund's final accounting statement. The court rejected defendant's contentions, characterizing them as breaches of the implied obligation of good faith and fair dealing, which, it said, is not recognized in this context. It also noted that there was no provision in the policy requiring the insurer to advise the insured as to the status of claims.

On appeal, Photocircuits argues that the evidence is undisputed that the Fund materially breached the policy by failing to perform its express duties. Photocircuits urges this Court to reverse the order appealed and grant its cross motion for summary judgment. The Fund counters that the court correctly granted its motion for summary judgment.

Workers' compensation insurance policies are no more than contracts, and as such are governed by the ordinary rules of

contractual construction (*see Matter of Covert*, 97 NY2d 68, 76 [2001]; *Matter of Davis v Block & Smith, Inc.*, 297 NY 20 [1947]). As in every contract for the performance of services, the party obligated to perform a service is required to do so in an "objectively reasonable manner under the circumstances" (*Pierson v Willets Point Contr. Corp.*, 899 F Supp 1033, 1049 [1995]). Here, Part One of the Fund's policy with Photocircuits specifically obligated it to defend Photocircuits against claims for workers' compensation benefits brought by its employees, and to pay only those claims for injuries caused or aggravated by the conditions of the claimant's employment.

Thus, the issue here is whether the Fund fulfilled this duty in an objectively reasonable manner. The majority of the contested premiums concern the two lifetime awards made to claimants Larice and Labrada. In both of those claims, Photocircuits had informed the Fund that the employees had injuries preexisting their employment. In such cases Workers' Compensation Law § 15 (8) (d) provides:

> "[T]he *employer or his insurance carrier* shall in the first instance pay all awards of compensation and all medical expense provided by this chapter, but such employer or his insurance carrier, except as specifically provided in paragraph (ee) of this subdivision, *shall be reimbursed from the special disability fund created by this subdivision for all compensation and medical benefits subsequent to those payable for the first one hundred four weeks of disability* . . . regardless of knowledge on the part of the employer as to the existence of such pre-existing permanent physical impairment" (emphasis supplied).

This section provides that the Special Disability Fund, rather than the general fund allocated for workers' compensation claims, reimburses claimants with preexisting injuries, and limits the employer's exposure to 104 weeks. It is unrefuted that the Fund twice failed to file for these benefits for Photocircuits' employees. In defense of its errors, the Fund claims that failure to file the necessary applications is not dispositive, because Photocircuits cannot establish that the Board would have granted the applications under section 15 (8). However, the Fund's argument ignores the fact that the Board cannot make a determination on a matter not submitted to it. Had the applications been submitted and approved, Photocircuits' retro-

spective premiums would have been reduced by some $484,263. Some of this has already been paid. Thus, Photocircuits asserts 85% of its liability to the Fund could have been eliminated had the payments to Larice and Labrada been capped at 104 weeks pursuant to Workers' Compensation Law § 15 (8).

In contending that summary judgment was properly granted, plaintiff relies on *Insurance Co. of Greater N.Y. v Glen Haven Residential Health Care Facility* (253 AD2d 378 [1998]) and *Commissioners of State Ins. Fund v J.D.G.S. Corp.* (253 AD2d 368 [1998]). These cases hold that New York does not recognize breach of the implied obligation of good faith and fair dealing as a defense to a claim that the insurer's deficient investigation or mismanagement of a claim file resulted in an increased retrospective premium. Both *Glen Haven* and *J.D.G.S.* deal with workers' compensation claims, and, in the ordinary course would provide plaintiff with immunity from the type of defense Photocircuits is asserting here. However, they cannot be read to give the Fund a blanket excuse for a failure to even minimally comply with its basic contractual obligations to perform in a reasonable manner.

In reviewing the settlement of insurance claims, the Court of Appeals has stated,

> "The notion that an insurer may be held liable for the breach of its duty of 'good faith' in defending and settling claims over which it exercises exclusive control on behalf of its insured is an enduring principle, well settled in this State's jurisprudence (*see, Gordon v Nationwide Mut. Ins. Co.*, 30 NY2d 427, *supra*; *Best Bldg. Co. v Employers' Liab. Assur. Corp.*, 247 NY 451, 453; *Brassil v Maryland Cas. Co.*, 210 NY 235, 241)." (*Pavia v State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445, 452 [1993].)

While in *Pavia*, the Court of Appeals ultimately held that because the insured had not shown more than ordinary negligence, the insured could not prevail (*id.* at 456), here, by contrast, the insured is relying on more than mere negligence. Photocircuits is asserting what amounts to a conscious disregard by the Fund of its basic contractual obligations to perform reasonably. To view these facts otherwise would be myopic. If one were to accept the Fund's position, there would no incentive for the Fund to control the insured's exposure to claims. Because of the mechanics of the RRP plan, the result would simply be: if the Fund pays more, it just passes it on to the

insured as retrospective premiums. Further, the Fund has an important role in protecting against runaway and fraudulent claims. If the Fund does not properly investigate a claim or fails to invoke the statutory protections given to employers, the Board cannot make fully informed decisions and sort out the real claims from the inflated and false ones. It is uncontested that the Fund paid benefits to a known impostor, and that it failed to apply for benefits under Workers' Compensation Law § 15 (8), appear at hearings and timely file appeals. The facts here are extreme, and our ruling reversing the grant of summary judgment in favor of the Fund should not be considered as relaxing the rule articulated in *Glen Haven* and *J.D.G.S.* However, in this case there is clearly a question of fact as to whether the Fund met its basic obligation to perform its duties to Photocircuits under the policy in a reasonable manner.

Accordingly, the judgment of the Supreme Court, New York County (Carol R. Edmead, J.), entered November 20, 2003, awarding the amount of $466,100 in favor of plaintiff Commissioners of the State Insurance Fund, and bringing up for review the order (denominated a judgment), same court and Justice, entered October 9, 2003 (as amended by the so-ordered stipulation dated on or about October 27, 2003), which, inter alia, granted plaintiff's motion for summary judgment and denied defendant's motion for summary judgment, should be reversed, on the law, without costs, the judgment vacated, and both the motion and cross motion for summary judgment denied. Appeal from the aforesaid order should be dismissed, without costs, as subsumed in the appeal from the judgment.

FRIEDMAN, SULLIVAN, NARDELLI and GONZALEZ, JJ., concur.

Judgment, Supreme Court, New York County, entered November 20, 2003, reversed, on the law, without costs, the judgment vacated, and both the motion and cross motion for summary judgment denied. Appeal from order (denominated a judgment), same court, entered October 9, 2003, dismissed, without costs, as subsumed in the appeal from the judgment.